## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,

          Plaintiff,

v.

Saladean Walker Salean,
*a/k/a* Michael Germane Walker,

          Defendant.

Case No. 22-cr-175 (NEB/TNL)

**REPORT & RECOMMENDATION**

---

Thomas M. Hollenhorst, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Manny K. Atwal, Matthew Deates, and Success Carter, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

---

### I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Saladean Walker Salean's Motion to Suppress Statements, Admissions and Answers, ECF No. 25. This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

The Court held a hearing on the motion on January 23, 2023. ECF No. 35. Assistant United States Attorney Thomas M. Hollenhorst appeared on behalf of the United States of

America (the "Government"). Attorneys Manny K. Atwal and Success Carter appeared on behalf of Defendant.

At the January 23 hearing, the Court heard testimony from Minneapolis Police Department ("MPD") Lieutenant Paul Albers, Sergeant Marcus Benner, and Sergeant Mark Suchta. The Government offered and the Court received:

1. Government Exhibit 1A, Lieutenant Albers interview on October 7, 2021;

2. Government Exhibit 1B, transcript of Government Exhibit 1A;

3. Government Exhibit 2A, Sergeant Alejandrino interview on October 7, 2021;

4. Government Exhibit 2B, transcript of Government Exhibit 2A;

5. Government Exhibit 3A, first Sergeant Benner interview on September 29, 2021;

6. Government Exhibit 3B, transcript of Government Exhibit 3A;

7. Government Exhibit 4A, second Sergeant Benner interview on September 29, 2021;

8. Government Exhibit 4B, transcript of Government Exhibit 4A;

9. Government Exhibit 5A, Sergeant Suchta interview on September 30, 2021; and

10. Government Exhibit 5B, transcript of Government Exhibit 5A.

Defendant offered and the Court received:

1. Defense Exhibit 1, Register of Actions from Hennepin County and Criminal Complaint; and

2. Defense Exhibit 2, medical records from Hennepin County Medical Center on September 29, 2021.

MPD Sergeant Philip Alejandrino was unavailable to testify at the January 23, 2023 hearing, and the parties agreed to continue the hearing to January 31 for him to testify. ECF No. 35; *see also* ECF No. 36 at 1. On January 25, 2023, the Government notified the Court that it decided it would not use Defendant's statements to Lieutenant Albers or Sergeant Alejandrino in its case-in-chief. ECF No. 36 at 1. The Government withdrew Government Exhibits 1A, 1B, 2A, and 2B, and stated that there was no need to re-open the motion hearing on January 31. *Id*. at 1-2. In response, Defendant withdrew Defense Exhibit 1. *Id*. at 2. The Court cancelled the January 31 hearing and set a post-hearing briefing schedule. *Id*. at 2-3.

Post-hearing briefing is now complete, and this motion is ripe for a determination by the Court.

## II. FINDINGS

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A. Sergeant Marcus Benner

Sergeant Benner is a licensed peace officer and has been a law enforcement officer for 27 years. Tr. 27:16-17, 28:3-5, 46:5-8, ECF No. 38.[1] He currently works as an investigator with MPD's homicide unit. Tr. 27:10-15.

---

[1] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due February 10, 2023, and no such notice was filed. ECF No. 38. Instead, Defendant filed a "Notice That No Redaction is Required," stating he would "not be requesting redaction as no redaction is required." ECF No. 39.

On September 29, 2021, Sergeant Benner was the on-call homicide investigator and received a call of a shooting in North Minneapolis. Tr. 28:9-14. He was told that an individual with the initials J.W. had been shot and was not expected to survive. Tr. 28:15-20. J.W. later died, and the shooting became a homicide investigation. Tr. 28:15-22, 47:17-48:4.

During the initial investigation into the shooting of J.W., officers determined that Defendant had been shot in the leg in North Minneapolis around the same time. Tr. 28:23-29:12, 30:7-10, 48:5-11, 50:6-12. Sergeant Benner reviewed the preliminary notes about the shooting of Defendant. Tr. 32:18-33:2, 48:19-49:5. He suspected the two shootings could be related, and he testified that the investigation into the shootings of J.W. and Defendant ultimately merged into one investigation. Tr. 30:19-31:10, 52:5-54:6, 62:1-9, 63:9-18.

At the time, Sergeant Benner "already had a PC pick-up out for [Defendant]" because Defendant was the suspect in a shooting from June 30, 2021. Tr. 30:10-12, 36:2-4, 50:9-19, 55:1-15. Sergeant Benner testified that a "PC pick-up" occurs when officers "have enough probable cause to arrest somebody, but not to charge somebody criminally for a crime." Tr. 36:5-8. Officers had been trying to locate Defendant for several weeks or months to arrest him on the PC pick-up. Tr. 41:1-3.

According to Sergeant Benner, he decided to interview Defendant because he was the victim of a shooting. Tr. 31:11-13, 23:18-34:1. On September 29, 2021, shortly after midnight, Sergeant Benner went to the Hennepin County Medical Center ("HCMC") and

ultimately interviewed Defendant twice.  Tr. 29:19-30:4, 31:14-19.  The interviews were

video- and audio-recorded.  Tr. 31:20-32:7; *see also* Gov't Exs. 3A, 3B, 4A, 4B.

During the first interview, Defendant was laying in a hospital bed in a "very, very,

very small" hospital room.  Tr. 34:20-23, 56:19-24; *see also* Gov't Exs. 3A, 3B.  Sergeant

Benner testified that although another uniformed officer was standing in the room for

officer and patient safety, which is common in most shooting cases, Defendant was not in

custody at the time.  Tr. 34:24-35:14.

Sergeant Benner introduced himself and told Defendant that he wanted to talk to

him about what happened that night.  Tr. 35:15-21.  Sergeant Benner testified that he did

not read Defendant his *Miranda* rights because he "was treating [Defendant] . . . strictly as

the victim or maybe a possible witness of a shooting."  Tr. 35:22-36:1.  Sergeant Benner

testified that he only reads *Miranda* warnings to an individual "[i]f they're a suspect of the

crime [he is] interrogating for them."  Tr. 47:7-11.  According to Sergeant Benner, at the

time of the first interview, his primary objective was to treat Defendant like a victim or

witness to the homicide of J.W.  Tr. 41:3-8.  He was not there to take Defendant into

custody on his PC pick-up at that time.  Tr. 36:9-11.  Sergeant Benner testified that he did

not speak with Defendant about the PC pick-up because, during the first interview, he

wanted to make clear that he was treating Defendant as a victim or witness of the shooting.

Tr. 39:9-15.

Sergeant Benner testified that while he was interviewing Defendant the first time,

Defendant was laying in a hospital bed with an IV in his arm, "obviously not the best he

could be" after having been shot recently.  Tr. 37:1-7, 55:20-56:1.  Still, Sergeant Benner

felt that Defendant's ability to track his questions and respond to them "was very good." Tr. 37:10-13.  According to Sergeant Benner, he often interviews people in hospitals and "sometimes people are either sedated or they're too out of it, and they will let [him] know that they [] can't talk, or they will just simply ask [him], [c]an [he] come back tomorrow morning."  Tr. 37:13-18.  That did not happen in this case, nor did Sergeant Benner feel that Defendant was unable to understand the interview process such that the interview needed to be terminated.  Tr. 37:19-25.

The interview lasted just a few minutes, and Sergeant Benner then left the room. Tr. 38:6-10.  Defendant did not admit to any wrongdoing, nor was Defendant ever charged with an offense related to the shooting of J.W.  Tr. 36:15-25, 38:1-5.

After the first interview, Sergeant Benner talked with other officers at the hospital and told them to stay outside Defendant's room.  Tr. 38:15-19, 57:6-10.  He did not want Defendant to leave because he had been looking to arrest him on the PC pick-up all summer.  Tr. 57:11-16.  According to Sergeant Benner, Defendant was not free to leave. Tr. 57:22-59:18.  Sergeant Benner planned to go back into Defendant's hospital room and place him in custody on the PC pick-up.  Tr. 38:20-39:2, 57:17-24.  He also planned to read Defendant his *Miranda* rights and interview him about the PC pick-up case.  Tr. 39:3-8, 41:8-13.

At about 3:00 a.m., Sergeant Benner went back into Defendant's hospital room for a second interview.  Tr. 41:15-17; *see also* Gov't Exs. 4A, 4B.  Sergeant Benner explained why he was coming back to speak with Defendant and read Defendant his *Miranda* rights. Tr. 41:18-23.  Sergeant Benner only used the word "rights" before explaining Defendant's

6

*Miranda* rights, and Defendant responded, "You mean my *Mirandas*," indicating to Sergeant Benner that Defendant understood what he was talking about.  Tr. 44:18-23. Defendant then provided answers to Sergeant Benner's questions.  Tr. 45:1-4.

Sergeant Benner testified that Defendant appeared to understand his questions, and he felt like he and Defendant had "a cordial conversation" and "a good rapport."  Tr. 45:5-10.  According to Sergeant Benner, while Defendant was "not extremely coherent" because he had been shot recently, he still seemed coherent and able to understand Sergeant Benner. Tr. 44:9-17.  Sergeant Benner officially arrested Defendant at 3:31 a.m.  Tr. 59:6-8.

### B.  Sergeant Mark Suchta

Sergeant Suchta is a licensed peace officer and has been a law enforcement officer for 24 years.  Tr. 64:19-20, 65:8-10.  He currently works as an investigator with MPD's homicide unit.  Tr. 64:12-18.

On September 29, 2021, Sergeant Suchta learned that an individual with the initials J.W. had been shot and was not expected to survive.  Tr. 65:24-66:16.  He also learned that Defendant had been shot, and officers later determined a link between the two shootings.[2] Tr. 66:19-67:1, 78:19-79:4.  Sergeant Suchta responded to the scene of the shootings, processed the scene, and looked at the evidence.  Tr. 68:22-69:9.

On September 30, 2021, at 7:00 p.m., Sergeant Suchta went to the Hennepin County Jail to interview Defendant about the shootings police were investigating.  Tr. 69:9-23, 80:1-5.  By that point, Defendant had been discharged from the hospital and taken to the

---

[2] According to Sergeant Suchta, officers now know that J.W. and Defendant had a confrontation and they both shot each other.  Tr. 67:2-11.

7

Hennepin County Jail, and it had been almost 40 hours since the time of the shooting.  Tr. 70:18-71:3.  The interview took place in one of the jail's visiting rooms and was recorded. Tr. 71:4-14; *see also* Gov't Exs. 5A, 5B.  No other officers were present, and Sergeant Suchta was not armed.  Tr. 71:9-12.

Sergeant Suchta entered one of the jail's visiting rooms and asked for Defendant. Gov't Ex. 5A at 00:00-01:01.  After waiting for about seven minutes, Defendant entered the interview room in a wheelchair and made some apparent groaning sounds.  Gov't Ex. 5A at 06:45-06:58; Tr. 80:24-81:3.  Sergeant Suchta asked Defendant how many times he was shot, and Defendant responded that he was shot twice and pointed to his injuries. Gov't Ex. 5A at 06:58-07:05; Tr. 81:8.  Sergeant Suchta asked Defendant if he was in a lot of pain, and Defendant said, "Yeah, a lot."  Gov't Ex. 5A at 07:05-07:08.  Sergeant Suchta then asked Defendant if the jail was giving him any pain medications, and Defendant said, "barely."  Gov't Ex. 5A at 07:08-07:13.

Sergeant Suchta told Defendant to "go ahead and get comfortable," introduced himself as a sergeant with the police department, and said he was there to talk to Defendant about the "incident yesterday where [he] got shot up."  Gov't Ex. 5A at 07:32-07:50; *see also* Gov't Ex. 5B at 1:17-21.  Sergeant Suchta told Defendant that they "have a guy dead" who was shot in the 1100 block of Irving, and that officers know that Defendant was there. Gov't Ex. 5A at 08:15-08:28; *see also* Gov't Ex. 5B at 2:6-8.  He told Defendant that officers got a search warrant for his phone.  Gov't Ex. 5A at 08:28-08:32; *see also* Gov't Ex. 5B at 2:8-9.  Sergeant Suchta told Defendant that officers have "some evidence which pretty much shows . . . what happened," and that officers were getting to the point that they

8

needed to hear Defendant's side of the story.  Gov't Ex. 5A at 08:33-09:02; *see also* Gov't

Ex. 5B at 2:10-18.  Sergeant Suchta then got "some housekeeping items out of the way,"

such as asking for Defendant's phone number, how long he and his wife had been married,

if he had kids, whether he was working, where he grew up, and if he graduated.  Gov't Ex.

5A at 09:02-10:46; *see also* Gov't Ex. 5B at 2:19-4:21.

> Sergeant Suchta then read Defendant his *Miranda* rights:

>> I'm just gonna read you your rights, 'cause you're here. I got
>> to read them 'cause you're here. And then I'll just kind of—
>> we'll just kind of talk about what happened, okay?

>> [Defendant], the Constitution requires that I inform you that
>> you have the right to remain silent. Anything you say, can and
>> will be used against you in court. You have the right to talk to
>> a lawyer now and have a lawyer present now or at any time
>> during questioning. If you cannot afford a lawyer, one will be
>> appointed to you without cost. [Defendant], do you understand
>> everything I just read to you?

Gov't Ex. 5A at 10:46-11:13; *see also* Gov't Ex. 5B at 4:22-5:5; Tr. 73:21-23.  Defendant

responded, "Mhm," and Sergeant Suchta told Defendant he had "to say yes or no," to which

Defendant responded, "Yes."  Gov't Ex. 5A at 11:13-11:15; *see also* Gov't Ex. 5B at 5:5-

7.  Sergeant Suchta testified that he felt Defendant understood his *Miranda* rights because

Sergeant Suchta read them very clearly, he asked Defendant if he understood the rights and

he responded that he did, and Sergeant Suchta "had no reason to not believe him."  Tr.

73:24-74:4.

> Defendant then spoke with Sergeant Suchta about the shooting for about an hour.

*See* Gov't Ex. 5A.  According to Sergeant Suchta, he and Defendant communicated "very

well."  Tr. 74:10-11.  Sergeant Suchta asked Defendant direct questions, and Defendant

answered all the questions "very clearly, freely, [and] intelligently." Tr. 74:11-12. Defendant's speech was not slurred, and he did not appear to Sergeant Suchta to be groggy or under the influence of any controlled substance or anything else. Tr. 74:13-16.

Sergeant Suchta testified that he has spoken to thousands of people over the course of his 24 years in law enforcement and feels that he is a good judge of when a person is under the influence of something. Tr. 74:16-19. In his judgment, Defendant was not under the influence of anything, and if he would have been, Sergeant Suchta would have tried to interview him at a separate time per MPD policy. Tr. 72:14-73:9, 74:19-21. While he did not ask Defendant about his medical condition, if he was under the influence of any drugs, or if he had recently taken any pain medication, Sergeant Suchta testified that nothing happened "during the course of the interview that suggested to [him] that [D]efendant did not know what was happening." Tr. 74:5-8, 81:6-11. Sergeant Suchta also testified that the Hennepin County Jail has an infirmary, and, to his knowledge, Defendant had not been to the infirmary. Tr. 73:10-17.

### C. Lieutenant Paul Albers

Lieutenant Albers is a licensed peace officer with about 18 years of experience as a police officer. Tr. 13:21-23, 14:18-19. He currently works as a patrol shift lieutenant with MPD. Tr. 13:14-20. In his role, he supervises about 25 officers on the overnight patrol shift in North Minneapolis. Tr. 14:13-17.

On October 7, 2021, Lieutenant Albers was assigned to MPD's assault unit, otherwise known as "the shoot team," which focuses on investigating non-fatal shootings. Tr. 14:20-15:4. On that date, he interviewed Defendant, also known as Michael Walker,

at the Hennepin County Jail.  Tr. 15:8-25.  At the time, Lieutenant Albers knew that Defendant was wanted for a shooting that resulted in the death of another person.  Tr. 21:10-12.  He was also aware that Defendant was a felon and therefore ineligible to possess a firearm.  Tr. 20:12-21:2.

Defendant was brought into the interview room by detention deputies at the jail.  Tr. 17:7-12.  The interview was recorded.  Tr. 17:13-18:1; *see also* Gov't Exs. 1A, 1B.  The interview occurred during the day in a small interview room at the jail.  Tr. 16:2-16. Lieutenant Albers conducted the interview alone, and he was unarmed and wearing business casual attire.  Tr. 16:17-17:2.

During the interview, Lieutenant Albers asked Defendant about two separate shootings that occurred on September 12 and September 26, 2021.  Tr. 25:4-11.  Though Defendant had been shot recently, Lieutenant Alberts testified that the conversation was normal and Defendant "seemed fine" and was "of a clear mind."  Tr. 18:20-25, 22:24-25. According to Lieutenant Albers, Defendant appeared to understand his questions.  Tr. 19:1-6.  Lieutenant Albers testified that Defendant seemed to be "not under the influence, not medicated, [and] not intoxicated."  Tr. 18:24-25.  While Lieutenant Albers could not recall whether Defendant was in a wheelchair at the time, he testified that he has interviewed several people in wheelchairs before and recalls that each of them tracked what he was saying when he interrogated them.  Tr. 17:3-6, 23:1-24:24.

### D.  Hospital Records

According to Defendant's medical records from HCMC Hospital, Defendant arrived at HCMC's Emergency Department on September 29, 2021 at 12:55 a.m. with a gunshot

wound to the right thigh and left thigh and a retained bullet near the left knee. Def. Ex. 2 at 50-51. At the scene, paramedics had placed a tourniquet on Defendant due to uncontrolled bleeding. *Id*. at 58.

When Defendant arrived at HCMC, his vitals were stable. *Id*. at 55. He was able to move his legs normally. *Id*. at 58. He denied feeling any numbness, tingling, or pain anywhere other than the bilateral thighs. *Id*. at 51. His treating providers described him as "[a]wake, alert, appropriate, [and] following commands." *Id*. at 53.

He was evaluated by the trauma surgery team and the orthopedic bone doctor team. *Id*. at 50. The images showed no broken bones and no damage to Defendant's vessels. *Id*. at 50. Doctors gave Defendant oxycodone for pain control and noted that he was "neuro intact" and "doing well." *Id*. They further noted that Defendant did not need any further doses of pain control at HCMC. *Id*.. Defendant's gunshot wounds were irrigated and dressed with wrap and gauze. *Id*.

Defendant was discharged at 5:13 a.m. "with a short course of pain control." *Id*. at 50. Specifically, he was discharged to the jail with a prescription for oxycodone and instructed to use ibuprofen and Tylenol during the day for mild pain. *Id*. at 50-51, 57.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following conclusions of law.

Defendant moves to suppress his statements, admissions, and answers. ECF No. 25. In this case, Defendant was interviewed five times by law enforcement officers: (1) Sergeant Benner on September 29, 2021 (Gov't Exs. 3A, 3B); (2) Sergeant Benner, again,

on September 29, 2021 (Gov't Exs. 4A, 4B); (3) Sergeant Suchta on September 30, 2021 (Gov't Exs. 5A, 5B); (4) Lieutenant Albers on October 7, 2021 (Gov't Exs. 1A, 1B); and (5) Sergeant Alejandrino on October 7, 2021 (Gov't Exs. 2A, 2B).

### A. Statements to Sergeant Benner, Lieutenant Albers, and Sergeant Alejandrino

As stated above, shortly after the motion hearing, the Government notified the Court that it decided it would not use Defendant's statements on October 7, 2021 to Lieutenant Albers or Sergeant Alejandrino in its case-in-chief. ECF No. 36 at 1. In its post-hearing briefing, the Government notified the Court that it decided it also would not use Defendant's statements on September 29, 2021 to Sergeant Benner in its case-in-chief. Gov't Post-Hearing Mem. at 10, ECF No. 46. Thus, with respect to Defendant's statements to Sergeant Benner, Lieutenant Albers, and Sergeant Alejandrino, the Government asks the Court to deny Defendant's motion to suppress as moot.

In light of the Government's representation that it will not introduce Defendant's statements to Sergeant Benner, Lieutenant Albers, or Sergeant Alejandrino during its case-in-chief at trial, Defendant's motion to suppress these statements is moot. *See United States v. Morris*, No. 17-cr-107 (DWF/TNL), 2018 WL 2193109, at *9 (D. Minn. May 14, 2018) ("Accordingly, Defendant's motion is denied as moot given the Government's representations that it does not intend to introduce evidence from the December 14, 2016 search and seizure in its case-in-chief."); *United States v. Tran*, No. 09-cr-172 (MJD/SRN), 2009 WL 10678912, at *16 (D. Minn. Oct. 9, 2009) ("[T]he Government states that it does not intend to introduce Defendant's responses . . . in its case-in-chief. Based on the

Government's representations, the Court recommends that this motion be denied as moot."), *report and recommendation adopted*, 2009 WL 10678930 (D. Minn. Oct. 27, 2009); *United States v. Tenerelli*, No. 07-cr-194(1), 2008 WL 420018, at *2 (D. Minn. Feb. 13, 2008) (denying motion to suppress as moot based on the Government's representation that it did not intend to use any statements made by the defendant in its case-in-chief); *United States v. Torres*, No. 17-cr-194 (WMW/TNL), 2018 WL 1160667, at *3 (D. Minn. Jan. 11, 2018), *report and recommendation adopted*, 2018 WL 1158007 (D. Minn. Mar. 5, 2018) (same). Accordingly, the Court recommends that Defendant's motion to suppress (1) his two statements to Sergeant Benner on September 29, 2021, (2) his statement to Lieutenant Albers on October 7, 2021, and (3) his statement to Sergeant Alejandrino on October 7, 2021, be denied as moot.

### B.  Statement to Sergeant Suchta

That leaves only Defendant's statement to Sergeant Suchta on September 30, 2021 at the Hennepin County Jail.  Defendant argues that the statement should be suppressed because he did not have the capacity to waive his *Miranda* rights in light "of his [gunshot] injuries and prescription pain medication."  Def. Mem. in Supp. at 14, ECF No. 44. Defendant contends that while Sergeant Suchta asked Defendant "if he was *receiving* any pain medications," he "did not follow up and ask what kinds of pain medication and how much," "whether [Defendant] was under the influence of such drugs," or inquire about Defendant's pain level and whether he was able to engage competently.  *Id.* at 14-15 (emphasis in original).  According to Defendant, Sergeant Suchta failed to establish his ability to make a knowing and intelligent waiver of his *Miranda* rights.  *Id.* at 15.

14

Therefore, he argues that his *Miranda* waiver cannot be deemed knowing, intelligent, or voluntary and his statement should be suppressed. *Id*. at 15. In response, the Government contends that Defendant's statement to Sergeant Suchta should not be suppressed because Defendant knowingly and intelligently waived his *Miranda* rights. Gov't Post-Hearing Mem. at 10. Because the Court finds that Defendant made a voluntary, knowing, and intelligent waiver of his *Miranda* rights, the Court recommends that Defendant's motion to suppress his statement to Sergeant Suchta be denied.

The Fifth Amendment requires that law enforcement inform a person of his or her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) before beginning a custodial interrogation. *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). A defendant may waive his or her *Miranda* rights, provided that the defendant does so voluntarily, knowingly, and intelligently. *United States v. Gallardo*, 495 F.3d 982, 990 (8th Cir. 2007). The burden is on the Government to show the waiver was valid by a preponderance of the evidence. *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). The Government "does not need to show that a waiver of *Miranda* rights was express. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). An implicit waiver of the right to remain silent "is sufficient to admit a suspect's statement into evidence." *Id*.; *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights."); *United States v. Soto*, No. 07-cr-223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) ("[A] defendant's willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver."). "Where the prosecution shows that

15

a *Miranda* warning was given and that it was understood by the accused, the accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis*, 560 U.S. at 384.

### 1. Voluntariness

A *Miranda* waiver is made voluntarily only if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *see also New*, 491 F.3d at 374 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)); *accord United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *Vinton*, 631 F.3d at 482 (quotation omitted); *accord Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary.'"); *New*, 491 F.3d at 374 ("Our cases hold that a confession may not be found involuntary absent some type of coercive activity on the part of law enforcement officials.") (quotation omitted). "In order to determine whether a confession was voluntary, [courts] look to the totality of the circumstances and must determine whether the individual's will was overborne." *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (quotation omitted). Courts look to whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." *United States v. Sanchez*, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotations and citations omitted).

As an initial matter, Defendant does not assert that Sergeant Suchta engaged in coercive activity. Nor could he. This Court's independent review of the audio recording of the September 30 interview with Defendant "clearly and readily indicates that [Sergeant Suchta] did not engage in threatening or coercive tactics." *See* Gov't Ex. 5A; *see also United States v. Evans*, No. 19-cr-294(2) (PJS/LIB), 2020 WL 1930586, at *5 (D. Minn. Mar. 4, 2020), *report and recommendation adopted*, 2020 WL 1923225 (D. Minn. Apr. 21, 2020). Sergeant Suchta was professional and respectful during the interview and made no threats or promises. *See Evans*, 2020 WL 1930586, at *5. The interview was conducted in a conversational tone, and Sergeant Suchta made no threats or promises to Defendant. *See United States v. Beaulieu*, No. 20-cr-235 (ECT/LIB), 2021 WL 3813317, at *5 (D. Minn. July 21, 2021) (concluding that the totality of the circumstances did not indicate that the defendant's will was overborne where the interview was conducted in a conversational tone and the interviewers made no threats or promises to the defendant), *report and recommendation adopted*, 2021 WL 3809927 (D. Minn. Aug. 26, 2021); *see also United States v. Mims*, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding *Miranda* waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); *see also United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir. 1995) (finding no coercive tactics where, among other things, "[n]o threats or promises were made"). Defendant spoke willingly and non-defensively with Sergeant Suchta throughout. *See Evans*, 2020 WL 1930586, at *5. He spoke clearly and responded to Sergeant Suchta's questions appropriately and coherently. *See Beaulieu*, 2021 WL 3813317, at *5. Further, the interview lasted only about an hour and was therefore not

coercive in its duration.  *See, e.g., Makes Room*, 49 F.3d at 415 (finding that interrogation lasting over two hours was not coercive in duration); *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir. 1988) (finding that interrogation lasting seven-and-a-half hours was not coercive in duration).  In sum, there is nothing in the record that demonstrates that Defendant was coerced into making his statement.  *See Vinton*, 631 F.3d at 482 ("There is no credible evidence that the police coerced [Defendant] into making the statements, or that his decision to speak with them was the product of anything other than a free and unconstrained choice.").

Nor does the fact that Defendant was in pain and taking pain medication(s) demonstrate that his will was overborne or that his statement was not made voluntarily.  "[T]he assertion of experiencing pain alone does not demonstrate that a Defendant's will is overborn."  *United States v. Barrett*, No. 19-cr-157(1) (WMW/LIB), 2019 WL 7580109, at *8 n.7 (D. Minn. Sept. 16, 2019) (citation omitted), *report and recommendation adopted*, 2019 WL 6168194 (D. Minn. Nov. 20, 2019).  Similarly, "[a] statement made by a person under the influence of medication is not necessarily involuntary."  *United States v. El-X*, No. 11-cr-109 (PJS/JJG), 2011 WL 3155691, at *3 (D. Minn. July 6, 2011) (citing *United States v. Harden*, 480 F.2d 649, 651 (8th Cir. 1973)), *report and recommendation adopted*, 2011 WL 3154859 (D. Minn. July 26, 2011).  "As long as the [defendant's] will was not overborne and the officer did not engage in coercive activity, even a defendant who is hospitalized and medicated may give a voluntary statement."  *Id*. at *4; *see also Beaulieu*, 2021 WL 3813317, at *4 (finding the defendant's statement voluntary where "nothing in the present record indicates that Defendant's medical condition was so severe as to render

18

his waiver and statements involuntary").

Here, "despite his injuries and medicated state," the Court finds that Defendant's will was not overborne and his capacity for self-determination was not critically impaired. *See El-X*, 2011 WL 3155691, at *4. While Defendant told Sergeant Suchta at the beginning of the interrogation that he was in "a lot" of pain, the Court's review of the audio recording of the interrogation does not indicate that Defendant displayed any "signs of severe pain or distress." *See* Gov't Ex. 5A at 07:05-07:08; *see also Beaulieu*, 2021 WL 3813317, at *6. As discussed above, the recording shows that Defendant was coherent, spoke clearly, and responded to Sergeant Suchta's questions appropriately. Additionally, as Sergeant Suchta testified credibly, Defendant's speech was not slurred, and he did not appear to be groggy or under the influence of any controlled substance or anything else. *See* Tr. 74:13-16. Throughout the interrogation, Defendant did not complain of severe pain or the inability to think clearly. In its independent review of the recording, the Court finds credible Sergeant Suchta's testimony that nothing happened "during the course of the interview that suggested . . . that [D]efendant did not know what was happening." *See* Tr. 74:5-8, 81:6-11. Further, "[t]here is simply no indication that [Sergeant Suchta] used any pain Defendant may have been suffering in order to secure a *Miranda* waiver or extract a confession." *See United States v. Class*, No. 15-cr-348 (PJS/TNL), 2016 WL 11491384, at *10 (D. Minn. May 5, 2016), *report and recommendation adopted*, 2016 WL 3512140 (D. Minn. June 22, 2016).

The fact that Sergeant Suchta did not ask Defendant what type or how much pain medication he was taking—or whether he was under the influence of such medication—

19

does not change the analysis. *See El-X*, 2011 WL 3155691, at *4 (finding that the defendant's statements were made voluntarily where "[a]lthough [the officer] knew that Defendant was taking medication, he did not know what it was or the dosage"). When Defendant was discharged from HCMC on September 29, 2021 at 5:13 a.m., doctors noted that Defendant did not need any further doses of pain control at HCMC and would be discharged "with a short course of pain control." Def. Ex. 2 at 50. Sergeant Suchta did not interview Defendant until 7:00 p.m. the next night. *See* Tr. 69:9-23. Thus, by that time, over 40 hours had passed since Defendant had been shot, and almost 38 hours had passed since he had been discharged from HCMC with a short course of pain control. As already noted, the record does not indicate that Defendant showed signs of severe pain or distress during the interrogation, and the recording shows that Defendant was able to understand Sergeant Suchta's questions and articulate appropriate answers.

Under all the circumstances, the Court concludes that, despite his injuries, pain, and medication(s), Defendant's will was not overborne. His *Miranda* waiver and statement to Sergeant Suchta were the product of a free and deliberate choice, and not the product of intimidation, coercion, or deception. Accordingly, the Court concludes that Defendant's waiver of his *Miranda* rights and subsequent statement to Sergeant Suchta on September 30, 2021 were voluntary. *See, e.g., United States v. Warbritton*, 360 Fed. App'x 698, 699 (8th Cir. 2010) (per curium) (affirming the denial of a suppression motion where "there was no evidence to suggest that law enforcement officers used coercive tactics while questioning [the defendant] after his vehicle accident, or that [the defendant's] will was overborne, despite his intoxication and injuries"); *United States v. Annis*, 446 F.3d 852,

856 (8th Cir. 2006) (rejecting the defendant's argument that "the pain from his injuries, combined with meth withdrawal, made it impossible for him to voluntarily and knowingly waive his rights," noting that the defendant "answered questions reasonably" and did not complain of pain and suffering during the interview); *Barrett*, 2019 WL 7580109, at *8 n.7 (finding that although Defendant stated that he was experiencing pain, he did not continue to complain of any pain throughout the interrogation); *United States v. Wright*, No. 15-cr-89 (JNE/FLN), 2015 WL 4136083, at *4 (D. Minn. July 8, 2015) (finding that statements made by a defendant who had been shot multiple times three days earlier were voluntary where "at the time of the interview he showed no signs of severe pain or distress" and the interviewing officer testified that the defendant "seemed coherent and lucid throughout the interview").

### 2. Knowing and Intelligent

The Court must also consider whether Defendant's *Miranda* waiver was knowing and intelligent. Defendant again argues that his recent injuries and pain medications prevented him from making a knowing and intelligent waiver of his rights. *See* Def.'s Mem. in Supp. at 14-15. The Court disagrees and finds that Defendant's *Miranda* waiver was knowing and intelligent.

It is not enough that the Government "establishes that a *Miranda* warning was given and the accused made an uncoerced statement. . . . The [Government] must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. "To make a knowing and intelligent waiver, the defendant must have 'full awareness of both the nature of the right being abandoned and the consequences of the decision to

21

abandon it.'" *Gallardo*, 495 F.3d at 990 (quoting *Moran*, 475 U.S. at 421). Whether a waiver is knowing and intelligent is based on the totality of the circumstances. *Id*. at 990-91. "Courts often consider whether the suspect was clearly under the influence of a substance or medication that might affect his ability to understand his rights; the timing of the interview as compared to ingestion of such substances; whether the suspect's speech was coherent; and if he seemed to understand the questions posed to him." *United States v. Booker*, No. 13-cr-3 (JRT/FLN), 2013 WL 12074955, at *2 (D. Minn. Mar. 8, 2013) (citations omitted), *report and recommendation adopted*, 2013 WL 12074956 (D. Minn. Mar. 27, 2013).

It is not clear exactly which, if any, pain medication(s) Defendant took on the date of the interrogation, or how long before the interrogation Defendant took the medication. But the record shows that Defendant was discharged from HCMC "with a short course of pain control" in the early morning hours of September 29, 2021. *See* Def. Ex. 2 at 50. Specifically, Defendant was discharged to the jail with a prescription for oxycodone and instructed to use ibuprofen and Tylenol during the day for mild pain. *See id*. at 50-51, 57. About 38 hours later, at about 7:00 p.m. on September 30, 2021, Defendant told Sergeant Suchta that the jail was "barely" giving him any pain medications. *See* Gov't Ex. 5A at 07:08-07:13. Thus, it is conceivable that the jail gave Defendant either oxycodone, ibuprofen, or Tylenol, or some combination of those medications, at some point on the date of the interrogation.

Notwithstanding the fact that Defendant may have taken pain medication that day, nothing in the record demonstrates that Defendant "was clearly under the influence of a

substance or medication that might affect his ability to understand his rights." *See Booker*, 2013 WL 12074955, at *2. As discussed above, Defendant appeared to track the conversation entirely, understand the questions being asked of him, and provide responsive and appropriate answers. Defendant spoke clearly and coherently during the interrogation, he did not slur his words, and he did not appear confused, groggy, or unable to understand his rights.

Moreover, as also discussed above, the Court credits Sergeant Suchta's testimony that Defendant did not appear to be under the influence of any controlled substance or medication he may have been taking. *See* Tr. 72:14-73:9, 74:13-21. The Court conducted an independent review of the recording of the interrogation and agrees with Sergeant Suchta that nothing happened "during the course of the interview that suggested . . . that [D]efendant did not know what was happening." *See* Tr. 74:5-8, 81:6-11. In light of Defendant's statements, answers, and demeanor during the interrogation, there was "no reason to not believe" that Defendant understood his *Miranda* rights when he confirmed he understood his rights. *See* Tr. 73:24-74:4.

Although Defendant was shot less than 48 hours before the interrogation occurred, the record shows that he understood what was occurring and the rights he was giving up by speaking with Sergeant Suchta and answering his questions. He had a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See Gallardo*, 495 F.3d at 990; *Moran*, 475 U.S. at 421. Therefore, under the totality of the circumstances, the Court concludes that Defendant's waiver of his *Miranda* rights was knowing and intelligent.

In sum, the Court concludes that Defendant waived his *Miranda* rights by responding to Sergeant Suchta's questions after being informed of his rights, and the waiver was voluntary, knowing, and intelligent. Accordingly, the Court recommends that Defendant's motion to suppress his statement to Sergeant Suchta at the Hennepin County Jail on September 30, 2021 be denied.

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements, Admissions and Answers, ECF No. 25, be **DENIED AS MOOT IN PART and DENIED IN PART**. Specifically, the Court recommends that Defendant's motion to suppress (1) his two statements to Sergeant Benner on September 29, 2021, (2) his statement to Lieutenant Albers on October 7, 2021, and (3) his statement to Sergeant Alejandrino on October 7, 2021, be denied as moot. The Court recommends that Defendant's motion to suppress his statement to Sergeant Suchta on September 30, 2021 be denied.


Date: May __8__, 2023                              _____*s/Tony N. Leung*_____
                                                   Tony N. Leung
                                                   United States Magistrate Judge
                                                   District of Minnesota

                                                   *United States v. Salean*
                                                   Case No. 22-cr-175 (NEB/TNL)

## **NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.